STATE OF FLORIDA, *ex rel.* HARRY C. DAVIS v. A. J. RYAN, *et al.,* Constituting Broward County Port Authority.

Case No. 1

STATE OF FLORIDA, *ex rel.* ALTON M. AKE, v. BROWARD COUNTY PORT AUTHORITY, *et al.*

Case No. 2

151 So. 416, 718
158 So. 62.
Opinions Filed December 7, 1933.
Rehearing Denied May 15, 1934.

44

, CASE No. 1

*Shutts & Bowen, L. S. Bonsteel* and *Chas. A. Carroll,* for Relator;

*C. H. Landefeld, Jr., McCune, Hiaasen & Fleming* and A. L. Gray, for Respondents.

CASE No. 2.

*C. L. Chancey,* for Relator;

*Cary D. Landis,* Attorney General, and H. E. Carter, Assistant; *McCune, Hiassen & Fleming* and *Rogers & Morris,* for Respondents.

PER CURIAM.—On June 14, 1932, an amended alternative writ of mandamus was filed herein containing a command that the respondents, as and constituting the Broward County Port Authority, forthwith, and without undue delay, pay over to the relator the sum of $1261.00 alleged to be held in respondents' custody and as such to be applicable and available to be paid over to relator upon certain indebtedness held by him in the form of City of Hollywood bonds which it is alleged the Broward County Port Authority had lawfully assumed and agreed to pay pursuant to competent statutory authority so to do. The writ, as amended, sets up a total alleged indebtedness claimed by relator amounting to $23,220.00. To apply on this claim, the writ asserts that there is on hand and available for payment in part satisfaction thereof, the sum of $1,261.00 in moneys raised and collected from taxation by said Broward County Port District to be applied to the district indebtedness, of which relator's claim is asserted to be a part.

The case is now before us for consideration upon respondents' demurrer to the amended writ of mandamus, as

well as upon relator's motion for a peremptory writ notwithstanding a special return filed by respondents setting up certain special defenses. In addition to the foregoing, there was received and permitted to be tentatively filed in this proceeding, a petition of the City of Hollywood praying that it be made a party respondent. Said petition was accompanied by an answer prepared in its behalf. The City of Hollywood's answer was likewise ordered to be received and filed for consideration as a part of the pleadings herein, subject to its being stricken out later should it be found on final hearing to be inapplicable, or such an intervention as ought not to be allowed to stand as part of the record in the present case.

It is accordingly disclosed by the record that in 1926 the City of Hollywood, purporting to act under its charter (Chapter 11510, Special Acts of 1925), issued bonds in the sum of $2,000,000.00 of which relator's bonds are a part.

The bonds so issued recited that they were issued for unspecified municipal purposes of the City of Hollywood, Florida, under and pursuant to and in strict compliance with the Constitution and statutes of the State of Florida and under and pursuant to proceedings duly adopted and taken by the City Commission of the City of Hollywood, Florida, all as required by law. It is further recited that the bonds were regularly and duly validated by decree of the Circuit Court of the Fifteenth Judicial Circuit of Florida on November 5, 1926. Recited also in such bonds, is the 1925 Charter Act of the City of Hollywood (Chapter 11519, *supra*) as the authority for their issue. Due execution of the bonds under the hand of the Mayor, attested by the signatures of the City Treasurer and of the City Auditor, under the city's seal, is made to appear by a copy of one of the bonds under consideration which is attached as an

exhibit and made a part of the amended alternative writ.

In 1927, by Chapter 12562, Special Acts of 1927, a Port District in Broward County was created. Acting under authority of this Act the Port Authority as part of the plan of its creation, took over a certain pending harbor project from the City of Hollywood and the City of Fort Lauderdale, which municipalities had together been projecting the same on their own credit and responsibility. Incident to this transaction, the Port Authority acquired from the two municipalities the balance of the proceeds of their bonds to the extent that such proceeds had not been expended on said harbor project, and agreed to repay the City of Hollywood and the City of Fort Lauderdale not only what they had expended, but also to pay the cities the amounts of the bond interest and maturities as they should become due.

In 1929, by Chapter 13940, Special Acts of that year, the Port District was authorized by resolution to assume payment of the municipal bonds in question and to become primarily liable thereon. Under authority of the 1929 Act an assumption agreement was entered into, and by a subsequent legislative Act (Chapter 15107, Special Acts of 1931), the Act creating the original Port District, set up in 1927, was repealed and a new District of like character created to take its place.

Section 5 of said Chapter 15107, Special Acts of 1931, specifically undertook to validate the prior assumption and enacted that the bonds of the cities of Hollywood and of Fort Lauderdale so assumed, should be the valid and binding obligation of the Port District created by the Act of 1931.

So the real question presented by the pleadings considered as a whole, is whether or not Chapter 15107, Special Acts of 1931, if a valid Act is sufficient to sustain and render enforceable against the Broward County Port District created

in 1931, the assumed bonds of the municipality, of which relator shows himself to be a holder.

The City of Hollywood was recognized under Chapter 12877, Special Acts, 1927, which abolished the old municipality and established a new municipality to be known as the City of Hollywood. The new municipality succeeded to all the property and property rights of the abolished corporation and became bound for its obligations, contracts and undertakings.

The Broward County Port District, as originally created, was organized under Chapter 12652, Special Acts, 1927. As laid out, it included both the cities of Hollywood and Fort Lauderdale, together with outside territory twelve to fifteen miles wide, extending westerly to the western county line of Broward County. The purpose of the creation of the new Port District appears to have been to establish in a described territory deemed to be benefited thereby, a new special taxing district, to be governed by a special Port Authority, which could and would take over, manage and operate for the general utility and benefit of the enlarged territory comprised in the Port District, the special Port improvements theretofore being projected solely as municipal works of the Cities of Hollywood and Fort Lauderdale, and in consideration thereof, to take over and assume, and agree to pay, the municipal debts that the cities of Fort Lauderdale and Hollywood had incurred up to that time in executing and bringing about the harbor improvements which the Act contemplated would be transferred in their entirety to, and become the assets of, the Broward County Port District. The enactment of Chapter 15107, Special Acts, 1931, merely validated and carried forward under a new organization, the original district established in 1927,

accompanied by an express validation of all the acts and proceedings previously had by the pre-existing district.

It therefore appears from the record that by a series of Acts of the Legislature relating to the cities of Hollywood and Fort Lauderdale, and creating a special taxing district designated as the Broward County Port District, certain harbor improvements have been actually constructed in part, if not wholly, by the proceeds of the bonds of the City of Hollywood, which the respondent Broward County Port District was authorized in terms to assume, and did assume, as the consideration for the transfer to the district, of the valuable asset represented by the improvement thus constructed, and that the Broward County Port District has, through its governing authority, specifically accepted, and now holds, uses and enjoys the exact asset which was constructed by means of the proceeds of the bonds of the City of Hollywood whose assumption by it under legislative authority, it now undertakes to repudiate while retaining and continuing to enjoy the benefits constituting the consideration for its assumption of the attendant liabilities.

Assuming, wihout deciding, that the Act of 1927 (Chapter 12562) creating the Broward County Port District was initially defective or invalid as to any purported unlimited power of taxation therein or thereby attempted to be authorized, as respondents contend, the legal existence of the district itself was not thereby destroyed, nor was its authority under the statute to contract for, and to operate, for the benefit of the territory involved, improvements in the form of harbor facilities already partly completed and in course of construction, thereby made ineffectual. And even if ineffectual in the first instance, the act of the District Authority was in unequivocal terms subsequently validated and made legal by the express provisions of Chapter 15107, Acts

of 1931, which specifically confirmed the whole of the transactions of the 1927 Governing Authority, with reference to the taking over of assets and the assumption of certain indebtedness in consideration thereof.

The Broward County Port District referred to in Chapter 12562, Acts of 1927, Chapter 13940, Acts of 1929, and as reorganized by Chapter 15107, Acts of 1931, was and is clearly a taxing district of a general and permanent nature designed to accomplish the general and permanent purpose of acquiring and holding lands, property, property rights, liens, leases, easements, etc., necessary for the purposes of the district which are in general to lay out, acquire, maintain, conduct and operate sea walls, piers, wharves, docks and general terminal facilities whose construction, maintenance and operation by the District at District expense, the Legislature deemed to be for the special benefit of the territory which the Port District was made to include. Such a special taxing district may be established by the Legislature for particular purposes, and if created directly by the Legislature, must be recognized and can only be judicially set aside upon a showing of gross abuse of the legislative power in the enactment of its act of creation. See Jinkins v. Entzminger, 102 Fla. 167, 135 Sou. Rep. 785, and cases cited.

The consideration for the enactment of the assumption provisions of Section 5 of Chapter 15107, Special Acts of 1931, was the transfer to the new Broward County Port District of the title, rights, ownership of property, taxes due, claims, judgments, decrees and choses in action theretofore held, possessed and enjoyed by the old Broward County Port District under the Acts of 1927 and 1929. None of such benefits so transferred to the new Broward County Port District have been renounced by the respond-

ents or by their predecessors in office. On the contrary, respondents purport to hold their offices and to exercise their powers as the governing authority of the new district on the legal predicate that such district is a valid one for the purposes of its creation.

A subsequent purchaser who expressly assumes the payment of a prior existing mortgage as part of the purchase price of a piece of property that he buys, is estopped to defend against the forclosure of the assumed mortgage upon any ground, since the assumed mortgage, whether valid or invalid, was a part of the consideration for the acquisition of property which the law will not permit the acquirer to hold without estopping him to question the liability which was assumed in order to obtain the benefit of it. Kew West Wharf & Coal Co v. Porter, 63 Fla. 448, 58 Sou. Rep. 599, Ann. Cas. 1914A 173n.

The same principle of estoppel will apply with equal force to a special taxing district which, while still holding, using and enjoying valuable public works transferred to, held and utilized by it for the special benefit of its inhabitants and property owners, undertakes to defend against the collection of moneys due on bonds issued to raise funds to accomplish such improvements, which bonds it has been authorized to assume, and has assumed and agreed to pay as a district debt, in consideration of the transfer to and acceptance by it of the public works, for which the proceeds of the assumed bond issue were expended to make possible.

Whether or not individual land owners having properties situate within, and subject to, the tax burdens of the Broward County Port District, have a justiciable cause of complaint against the exercise of the district's taxing power with respect to their individual properties, because of a palpable abuse of the legislative power in the inclusion of their lands

within the boundaries of the district, is a question not capable of being tried in a mandamus proceeding of this kind, therefore the special defenses sought to be interposed herein on their behalf by the respondent district officials, must be stricken, without prejudice to the individual rights of any of such taxpayers to pursue appropriate proceedings to have any complaint made by them duly adjudicated.

It follows that the motion to quash, and the demurrer to, the alternative writ of mandamus, as amended, must be overruled; that the intervening answer of the City of Hollywood allowed to be interposed by it as the primary obligor on the assumed bonds must be held good; that the answer and return of the respondent officials of the Broward County Port District must be held insufficient; and that the motion of relator for the issuance of a peremptory writ of mandamaus herein must be granted.

Let an appropriate judgment be entered.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL and BUFORD, J. J., concur.

BROWN, J., not participating because of illness.

PER CURIAM.—The City of Fort Lauderdale under authority of its special legislative charter (Chapter 10552, Special Acts of 1925) issued $2,000,000.00 of its bonds for the purpose of paying part of the cost of construction of a harbor project originally known as "Lake Mabel" but now designated as "Port Everglades." These bonds were issued and sold and some of them are held by relator, in the amounts and numbers shown in the alternative writ of mandamus.

The respondents are officials of the Broward County Port District which was originally created under Chapter 12562, Special Acts of 1927. The district now exists under authority of Chapter 15107, Special Acts of 1931. It is shown

by the record here that the district as originally created and as it now exists embraced 427,520 acres of land constituting the south 14 miles of Broward County extending from the Atlantic Ocean westward through the Everglades for a distance of fifty miles. Embraced within the district at the time of its creation were the municipalities of Fort Lauderdale, Hollywood, Dania, Davie and Hallandale. The moneys derived from the sale of the bonds issued by the City of Fort Lauderdale were contributed to and expended as part of a fund raised by Fort Lauderdale, Hollywood and certain private interests to construct a harbor known as "Port Everglades" and works incident thereto. The harbor project as finally completed and put into operation, has been taken over as the property of Broward County Port District which as a consideration for the transfer of this asset to it, assumed and agreed to pay the Fort Lauderdale bonds whose proceeds were used toward its construction. Chapter 15107, Special Acts of 1931, expressly recognized and validated the assumption on this basis.

So the bonds of the City of Fort Lauderdale held by relator not having been paid either by the original obligor or by the Broward County Port District, this suit in mandamus was brought against the Broward County Port District to enforce and cause the district to carry out its assumption obligation by making provisions for the payment of the bonds so assumed. Respondents resist any attempt to make the district pay the bonds in question, setting up as defenses certain matters which they assert to show that the assumed bonds were unconstitutionally issued and therefore should not be paid.

But whether the bonds as originally issued by the City of Fort Lauderdale were valid or invalid in their inception,

it appears beyond cavil that the moneys derived from such bonds were actually used toward the execution of the harbor project for which such bonds were issued, and that the project as completed and put into actual operation, has been transferred to, accepted by, and is being used for, the special utility and benefit of the Broward County Port District.

In Chapter 15107, Special Acts of 1931, in Section 5 thereof, the Legislature has in contemplation of law determined that the Broward County Port District has been specially benefited to the extent of the amount of the unpaid bonds of Fort Lauderdale and Hollywood originally issued for the purpose of carrying out the harbor project on the credit and responsibility of the municipalities alone, whose bonds have been assumed by the Broward County Port District. That such an assumption of the debt growing out of the cost of constructing a project which has been taken over as an asset by a new and enlarged district for its benefit, may be constitutionally imposed as a means of protecting the creditors of the original obligors on the bonds, as well as a means of requiring payment to be made for the asset taken over, seems hardly open to serious challenge, especially when the transferee still claims to hold and enjoy the benefit of that for which the burden of assumption was imposed. The principle to be applied in such case is in its essence no different from that applied in this state so recently as in Harwell v. Hillsborough County, 111 Fla. 361, 149 Sou. Rep. 547. See also Key West Wharf & Coal Co. v. Porter, 63 Fla. 448, 58 Sou. Rep. 599, Ann. Cas. 1914A, 173n, where a similar principle was applied to the assumption of a mortgage as part of the consideration for a conveyance of the mortgaged property.

We find this case no different in substance from its com-

panion case of State, *ex rel.* Harry C. Davis, v. Ryan, *et al.,.* as and constituting Broward County Port Authority, and upon the authority of that decision it is herein determined that relator in this case is entitled to a peremptory writ notwithstanding the demurrer to the alternative writ and the relator's special return filed thereto subject to a ruling on the demurrer.

Inasmuch, however, as the 1932 tax roll has been released from the operation of the alternative writ herein, an opportunity should be given relator to so amend the alternative writ herein as to make the relief herein and hereby awarded him effective, pending which no formal judgment for a peremptory writ will be entered.

Peremptory writ awarded on condition of amendment of alternative writ.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL and BUFORD, J. J., concur.

BROWN, J., not participating because of illness.

PER CURIAM.—The arguments on rehearing are predicated mainly upon the suggestion that the Court overlooked the contentions for respondents that the bonds in controversy, issued by the municipalities, and by statutory authority assumed by the Port District, are illegal and void *ab initio* upon the asserted ground that the issue of such bonds by the municipalities violates the provisions of Section 10, Article 9 of the Florida Constitution that: "The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." Decisions of this and other courts are cited, which, it is argued, support the contentions made. Much industry, research, and ability

of counsel are shown by the briefs which have been of great assistance to the court. The quoted provisions of the Constitution is controlling in cases where it is applicable. See Brumby v. City of Clearwater, 108 Fla. 149 So. 203.

The statutes applicable to this case do not authorize any city or district to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution, or individual; and it is not contended that either of the cities or the district has become a stockholder in any company, association or corporation. But it is contended that the bonds in controversy are illegal and void because of stated activities of J. W. Young resulting in a tripartite agreement, and because of the agreement itself entered into June 28, 1926, between the City of Fort Lauderdale, party of the first part, the City of Hollywood, party of the second part, and Hollywood Land & Water Company, the Home Seekers' Realty Company, Hollywood Development & Harbor Company, all Florida Corporations, and J. W. Young, an individual, parties of the third part, having reference to the issue of bonds by each of the cities and the use of the proceeds thereof for the construction of a harbor improvement situated in both cities, such harbor being now called Port Everglades. It is argued that in issuing the bonds the cities severally do in effect obtain or appropriate money for, or lend the credit of the cities to, the corporations and that the individuals who are the parties of the third part to the tripartite agreement of June 28, 1926, thereby in effect violating the above quoted provision of Section 10, Article 9 of the Constitution, and rendering the bonds issued by the cities for the harbor improvement illegal and void *ab initio*.

A purpose of the quoted organic provision is to prohibit

the use of public funds in enterprises or projects in which private parties have private rights of ownership or use. There is in the organic provision no purpose to forbid contributions by private parties to an enterprise or project that is wholly public in ts nature, ownershp, management and use.

In the cases pncipally relied on by counsel for respondents the statutes attempted to expressly authorize the use of public funds for enterprises or projects in which private parties had private property rights of ownership or use. See Pleasant Township v. Aetna Life Ins. Co., 138 U. S. 67, 11 S. Ct. 215 34 L. Ed. 864; Lord v. Denver, 58 Colo. 1,143 P. 284, L. R. A. 1915B, 306 Ann. Cas. 1916C 893. Citizens' Sav. & Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455, involved a manufacturing enterprise. In Munroe v. Reeves, 71 Fla. 612, 71 So. 922; State, ex rel. Nuveen, v. Greer, et al., 88 Fla. 249, 102 So. 739, 37 A. L. R. 1298; Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716; Holland v. State, 15 Fla. 455; and, State v. L'Engle, 40 Fla. 392, 24 So. 539, the statutes expressly authorized the bond issues that were impliedly forbidden by the Constitution. See, also, Johnson v. Board, 81 Fla. 503, 88 So. 308; Leonard, et al., v. Frankin, et al., 84 Fla. 402, 93 So. 688. Here the public harbor project and the bond issues are authorized by statute, and are not expressly or impliedly forbidden by the Constitution. The project is a public and not a merely quasi public improvement.

In this case the statutes do not authorize private parties to participate in the control of the public improvement project, which is a deep-water port harbor connected with navigable waters of the Atlantic Ocean. Private parties have no private ownership rights in this harbor. The charter acts of the cities authorize the issue of municipal bonds for purposes that fairly include the public harbor project

for which the bonds were issued. Illegality in the proceedings taken in issuing the bonds is not shown. The bonds were validated by judicial decree under the statute before they were sold. The bonds issued by the City of Fort Lauderdale were validated by Chapter 12739, Special Acts of 1927. See also Chapter 12877, Special Acts of 1927. The validating judicial decrees were not appealed from and are not shown to be invalid. The bonds are not illegal on their face. It is not made to appear as against the statutes, and the court decrees that the municipal bonds were issued to obtain money or credit for private parties. An unlawful use of the proceeds of bonds legally issued and sold may not affect the validity of the bonds in the hands of *bona fide* holders for value. If property owners and others are benefited by the public project, the municipal bonds issued for the public project are not thereby rendered invalid; the public project being by the statute made a municipal purpose. See Hunter v. Owens, 80 Fla. 812, 86 So. 839; City of Venice v. State, 96 Fla. 527, 118 So. 308; West, *et al.*, v. Town of Lake Placid, 97 Fla. 127, 120 So. 361; Whitney v. Hillsborough County, *et al.*, 99 Fla. 628, 127 So. 486. Neither the Constitution nor the statute forbids private parties to contribute to the public improvement, no private rights being acquired in the public project by the contributors.

There are averments in the answers of respondents to the effect that J. W. Young and his corporations acquired the bed of Lake Mabel and surrounding lands aggregating approximately 12,000 acres, the greater portion of the land being low, swampy marsh land which required drainage and filling in to make it habitable; that under glowing advertisements the land was subdivided, and sales to the public aggregated $75,000,000; that when the City of Holly-

wood was created in 1925, J. W. Young and his companies owned 80 per cent. of the land in the city and that J. W. Young and his employees were named commissioners of the city for four years; that J. W. Young and his companies undertook to build a deep-water harbor at Lake Mabel, now known as "Port Everglades," at a cost of $15,000,000, and issued and sold to the public $5,000,000 of bonds of the Hollywood Development & Harbor Company: that the project failed; "that some time prior to the 28th day of June, 1926, the said J. W. Young and his Hollywood Allied Companies for the purpose of relieving himself and his corporations from the burden of defraying the cost of the construction of said deep water harbor at Lake Mabel and for the purpose of fulfilling and carrying out their said scheme and plan so advertised and published as aforesaid for the construction of said deep water harbor at Lake Mabel the purpose of which was by the said J. W. Young and his Hollywood Allied Companies calculated to be of great private gain and financial benefit to the said J. W. Young and his Hollywood Allied Companies commenced negotiations with the officials of the said cities of Hollywood and Fort Lauderdale, which last named city is a municipal corporation organized and existing under a special charter in the State of Florida, to-wit, Chapter 10552, Special Acts of 1925, with the view of converting the construction of said deep water harbor into a public enterprise, and of inducing the said Cities of Fort Lauderdale and Hollywood of defraying and paying a portion of the costs and expenses of constructing said deep water harbor; that said negotiations resulted in the execution of an agreement bearing date June 28, 1926, commonly known as the tripartite agreement."

The above and other like and kindred averments do not

render illegal the issues of municipal bonds involved in this case, when no illegality is shown in the statutes and the proceedings had thereunder resulting in the bond issue. It is not shown that J. W. Young or his employees acted for either city in issuing the municipal bonds or in making contracts with J. W. Young or his corporations.

The tripartite agreement of June 28, 1926, contains, among others, these statements:

"2. That the construction of a deep water harbor at Lake Mabel is a feasible and practicable project of state-wide, even nation-wide importance, and such construction will be particularly advantageous to the municipalities herein named.

"3. That the contracting parties deem it to the best interests of the public that said harbor be constructed, maintained and operated as a public enterprise."

This indicates the nature of the project as a public improvement. The agreement contemplated the issue of $2,000,000 of bonds by each of the two cities to be used in the public harbor improvement project, the proceeds of the bonds to be used within the limits of the city issuing the bonds. The corporations and the individuals who were the parties of the third part to the tripartite agreement owned lands used in the harbor improvement, and they were to contribute one-third of the cost of the project and in return for the deposit of excavated material on lands of the third parties, to convey to each city land therein to be used for the sole exclusive, and only purpose of constructing municipal docks, piers, slips, wharves, and warehouses, or else to revert. The private parties were to have credit for what they had expended in constructing the harbor. Such parties of the third part were also to dedicate to the public for harbor purposes portions of the bed of Lake Mabel owned

by the parties of the third part; and to dedicate stated land for street purposes. The private parties were given no rights of ownership, use, or control in the public harbor project. Contracts for the harbor improvements were to be between the cities severally and the construction contractors, the contracts by each city having relation to improvements within its limits. The corporations, and the individual who were parties of the third part to the agreement with the two cities, were to have no right of private ownership or user in the harbor, the subject of the public improvement. Thus, the harbor, a public improvement located in two cities, was under the control of the two cities; the corporations and the individual who were the parties of the third part to the tripartite agreement of June 28, 1926, being merely contributors to the construction of the public improvement without any right in its ownership, use, or management except that common to the public.

An agreement dated October 27, 1927, between the Broward County Port Authority, the two cities, and the several private parties, substituted the Port Authority for the two cities, and is of similar import to the agreement of June 28, 1926. The Port Authority had statutory authority to assume the project then being constructed with appropriate power of taxation for the authorized purposes.

The charter act of the City of Fort Lauderdale, Chapter 10552, Special Acts of 1925, authorized the city to issue bonds for municipal purposes and gave the city broad and comprehensive powers, including the power "To establish, construct, maintain, operate and control public landings, public wharves, and docks within and without the City; * * * to dredge or deepen the harbor or river or any branch or portion thereof. * * *" Section 7 (j). See validating Acts as to "harbor bonds," Section 2, c. 12739, Special Acts

of 1927. The power to impose taxes for the authorized purposes was given by the statute.

The charter Act of the City of Hollywood, Chapter 11519, Acts of 1925 (Ex. Sess.), authorized the city to issue bonds for municipal purposes and gave the city broad and comprehensive powers, including the power:

"To construct and improve, maintain and operate canals, sea-walls, waterways and bathing beaches.

"To establish, maintain and operate public landings, piers, public wharves and docks within the City; * * * to dredge or deepen the harbor, river, canal or any branch or portion thereof. * * *" Article 2, Section 2, Subds. 18, 19.

Appropriate taxing powers for authorized purposes were conferred.

On June 28, 1926, the two municipalities and private parties entered into a tripartite agreement, referred to above, for the construction of deep-water harbor, within the limits of the two cities, each city to contribute one-third of the cost to be used in its borders, and the private parties the other third of the cost of the harbor and its incidental improvements. Each city issued $2,000,000, of bonds for the purposes within the powers conferred by the respective charter acts. Under such agreement and supplemental agreements, work on the harbor project proceeded.

Chapter 12562, Special Acts of 1927, established Broward County Port District, covering the territory within the limits of the City of Fort Lauderdale and within the City of Hollywood, and other territory in addition thereto. The governing body of the district was designated Broward County Port Authority, consisting of officers of the district. The Port Authority was by the statute given power, among other things, to create and improve for harbor purposes any waterways within the district, and to contract with munic-

ipalities in the district for the purposes authorized by the Act, and to assume contracts of the municipalities pertaining to the work authorized by the Act. The power to impose taxes for the authorized purposes was also conferred by the statute.

On October 27, 1927, subsequent to the enactment of Chapter 12562, Special Acts of 1927, the Broward County Port Authority, the two cities, and the several private parties entered into an agreement supplementary to the tripartite agreement of June 28, 1926, above referred to, by which the public harbor project was transfererd to the Port Authority of the district. This agreement does not invalidate the bonds. There appear to be no private ownership or user rights in the public harbor project.

By Chapter 13940, Special Acts of 1929, approved May 7, 1929, the Port Authority, representing the Broward County Port District, was "expressly authorized and empowered by resolution to assume the payment of, and thereby become primarily obligated to pay, and pledge its full faith and credit for the purpose of paying, any bonds heretofore voted, issued and sold by both or either the City of Fort Lauderdale or the City of Hollywood, municipal corporation situate within said District, for harbor purposes, and/or to assume the payment of and become primarily obligated to pay and pledge its faith and credit for the purpose of paying, any such bonds heretofore voted, issued or disposed of by either or both of said municipalities, the proceeds of which have heretofore or may hereafter be expended in the construction and/or maintenance of Port Everglades (formerly Lake Mabel Harbor); provided, however, that the total amount of bonds, payment of which may thus be assumed by said Port Authority, so issued, sold or disposed of by the said City of Fort Lauderdale shall not

exceed in the aggregate sum of Two Million ($2,000,000.00) Dollars as principal, plus accrued and unpaid interest thereon, and provided also that the total amount of bonds, payment of which may be thus assumed by said Port Authority, so issued, sold or disposed of by the City of Hollywood 'shall not exceed in the aggregate the sum of Two Million ($2,000,000.00) Dollars as principal, plus accrued and unpaid interest thereon." Section 5.

The power of taxation was conferred for the purposes authorized by the statute. The above-quoted provision refers to (1) bonds theretofore "voted, issued and sold" "for harbor purposes," and to (2) bonds theretofore "voted, issued or disposed of" "the proceeds of which have heretofore or may hereafter be expended in the construction and/or maintenance of Port Everglades" within the limits stated.

On July 10, 1929, the Broward County Port Authority, the governing body of Broward County Port District, adopted a resolution reciting in effect that each of the municipalities, City of Fort Lauderdale and City of Hollywood, had issued and sold $2,000,000 of negotiable bonds, the proceeds of which bonds were expended in paying a part of the cost of constructing the harbor of Port Everglades in the district; and that each of said cities had transferred to the Broward County Port Authority the public improvement then being constructed, called Port Everglades, and had also transferred to the Broward County Port Authority the unexpended proceeds of all of said bonds for use in the construction of the harbor; and that in consideration thereof the Broward County Port Authority contracted to pay to each of said cities the principal and accrued interest upon said bonds; and that it was agreed that the Broward County Port Authority, when lawfully authorized to do so, would by resolution expressly assume the payment of said

bonds; that pursuant to the statute authorizing such assumption (Chapter 13940, Special Acts of 1920), "Be it resolved that the Broward County Port Authority has assumed and hereby assumes the payment of, and by the adoption of this resolution becomes primarily obligated to pay, and pledges its faith and credit for the purpose of paying, all of the bonds so issued and sold by each of said cities of Fort Lauderdale and Hollywood as hereinabove recited," the private parties relinquished their rights, if any they had, to the Broward County Port Authority.

Chapter 15107, Special Acts of 1931, abolished "Broward County Port District," established under Chapter 12562, Special Acts of 1927, as amended by Chapter 13940, Special Acts of 1929, repealed such two chapters and established a new Broward County Port District within the same territory with the same governing authority. Sections 4 and 5 of the Act provide:

"That the title, rights, ownership of property, uncollected taxes due, claims, judgments, decrees and choses in action held or owned by the Broward County Port District, or its governing Body, the Broward County Port Authority, shall pass to and be vested in the Broward County Port Authority, the governing body of the new Broward County Port District, established and organized under this Act to take the place of and succeed the Broward County Port District hereby abolished.

"That no obligations or contracts of the Broward County Port District, and/or the Broward County Port Authority, including bonds heretofore issued or authorized or assumed by the Broward County Port District shall be impaired or avoided by this Act, but any such debts and obligations shall pass to and be binding upon the new Broward County Port District and/or Broward County Port Authority, which is

hereby organized and created. That the bonded indebtedness of the City of Fort Lauderdale, and of the City of Hollywood, Florida, heretofore assumed by the Broward County Port District under the Port Act herein repealed shall be the valid and binding obligation of the Broward County Port District hereby created and established."

Municipal bonds issued without competent legal authority or for a purpose that is forbidden by controlling law are invalid even in the hands of *bona fide* holders for value. And recitals of compliance with law contained in municipal bonds, cannot confer authority not legally given to issue the bonds, 44 C. J. 1248; State, *ex rel.* Nuveen, v. Greer, 88 Fla. 249, 102 So. 739; 37 A. L. R. 1298; Holland v. State, 15 Fla. 455; State, *ex rel.* Bours, v. L'Engle, 40 Fla. 392, 24 So. 539; Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716; Munroe v. Reeves, 71 Fla. 612, 71 So. 922; Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253; Jones v. McMahon (Fla.) 151 So. 712; First Natl. Bank of Key West v. Board of Public Instruction, 107 Fla. 525, 145 So. 203; O'Brien v. Wheelock, 184 U. S. 450, 22 S. Ct. 354, 46 L. Ed. 636; Sutliff v. Lake County Comm'rs, 147 U. S. 230, 13 S. Ct. 318, 37 L. Ed. 145. Essential requirements of a statute authorizing the issue of bonds must be complied with, or the bonds will be invalid. Bissell v. Spring Valley Township, 110 U. S. 162, 3 S. Ct. 555, 28 L. Ed. 105.

Where there is adequate legal authority for the issue and sale of municipal bonds and the bonds are issued for an authorized municipal purpose, mere administrative or ministerial irregularities in issuing the bonds may not render the bonds invalid in the hands of a *bona fide* holder, particularly when the bonds contain a statement that the laws have been fully complied with in issuing the bonds. See

Crawford v. State *ex rel.*, 110 Fla. 301, 149, So. 340; State v. Rodes (Fla.) 151 So. 289; Jefferson County v. B. C. Lewis & Sons, 20 Fla. 980; Town of Aurora v. Gates, 125 C. C. A. 329, 208 F. 101, L. R. A. 1915A, 910, and notes. An illegal use of the proceeds of bonds legally issued and sold to *bona fide* holders for value may not affect the validity of the bonds. 44 C. J. 1247.

While the purpose for which, and the extent to which, bonds of a municipality may be issued are to be defined by statute, yet where such bonds are to be paid through the exercise of the power of taxation, organic limitations upon the taxing powers of the municipality may also limit or control the power to issue bonds to be paid by taxation.

Where the Constitution forbids the Legislature to authorize a municipality to obtain or appropriate money for, or to loan its money to any corporation, association, institution or individual, bonds authorized and taxes levied under a valid statute for a lawful purpose cannot legally be used for the forbidden purpose. See Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203; and an unlawful use may be restrained; but the proceeds of bonds duly authorized and legal tax collections may be used for lawful purposes under valid statutes.

Although Chapter 9294, Acts of 1923, Section 250, Compiled General Laws, makes it unlawful for any person to vote or participate in any county, district, or other bond election held in this state, who is not a freeholder therein, and who is not otherwise qualified as a voter therein, yet a special or local law prevails which is inconsistent with such general law by prescribing different qualifications for electors in an election held to authorize the issue of municipal bonds. Section 24, Art. 3, Section 8, Art. 8, Constitution. See State v. City of Avon Park, 95 Fla. 494, 118

So. 223; West *et al.*, v. Town of Lake Placid, 97 Fla. 127, 120 So. 361.

The two cities and the port districts are public entities under statutory authority and their powers and obligations are regulated by statutes shown to be sufficient to authorize the issue by the two cities respectively of the bonds in controversy as well as their assumption by the district. Fraud in procuring the issue or the assumption of the bonds is not shown; and it does not appear that the bonds were issued to obtain or appropriate money for, or to loan the credit of the cities to, any corporation, association, institution, or individual.

It is averred that the "plan provided that the City of Hollywood and the City of Fort Lauderdale would not own said project when completed, and would not control, regulate or operate said harbor, nor would the same be used in carrying out the municipal functions of Hollywood and Fort Lauderdale, but on the contrary the said project was to be used in stimulating business so J. W. Young and his Hollywood Allied Companies would have a ready market for their vast areas of land owned adjacent to, or in the vicinity of, said harbor." These averments are not sustained by the statutes of the record proceeding had in issuing the bonds.

Counsel for the respondents state that the two cities were not to be the owners of the project, and were not to have any control over the project; and that the bonds of the cities were to be used for the construction of an incomplete project. Apparently the proceedings contemplate a completed public improvement harbor project, and the private parties are given no authority over the public improvement which the cities had authority to make; and even if the contemplated contribution by the private parties is not made or the project fails of completion, or is not successful, that

shows misfortune or lack of wisdom in undertaking the public harbor project, not lack of authority to exercise the powers conferred by the charter Acts upon the two municipalities. Subsequent events do not invalidate the bond issues, and illegal uses of bond proceeds may be enjoined or otherwise redressed by due course of law.

The bonds here in controversy issued by the City of Fort Lauderdale under Chapter 10552, Special Acts of 1925, and by the City of Hollywood under Chapter 11519, Acts of 1925 (Ex. Sess.) appear to be in accord with the statutes under which they were issued. They state that they were issued in accordance with the requirements of the Constitution and laws of Florida, and that all laws have been complied with in their issue. Board of Commissioners Henderson County v. Travelers' Insurance Co. (C.C. A.) 128 F. 817. They were issued for a public municipal project. See City of St. Petersburg v. Meyers (C. C. A.) 55 F. (2d) 810; Stockton v. Powell, 29 Fla. 1, 10 So. 688, 15 L. R. A. 42. See also Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119. The bonds are not illegal on their face, they have been judicially validated under the statutes, and pursuant to statutory authority, they were assumed by the governing authority of the Broward County Port District in 1929, before the amendment to Section 6, Article 9 of the Constitution, in 1930, was adopted, which required county, city and district bonds to be issued only upon an approving vote of specified classes of electors.

The statutes establishing the port district made no specific reference to the tripartite agreement between the two cities and the private parties; and even if the action taken under the tripartite agreement can be regarded as illegal, the bonds were legally issued for authorized municipal purposes and the public project for which the bonds were issued

has been transferred and relinquished to, and taken over by, the district, and the payment of the bonds has been assumed by the district under statutory authority, and the statute is not shown to be invalid. Where municipal bonds are legally issued, any illegal use of the bonds or their proceeds may be enjoined in appropriate proceedings. Even if some of the disbursements of the proceeds of the bonds issued by the two cities were unauthorized, the statute authorizes and the district took over the harbor improvement project and its assets and assumed the obligation of the bonds.

The authority given the district by Chapter 12562, Special Acts of 1927, as amended by Chapter 13940, Special Acts of 1929, to assume the bonded debt of the two cities incurred in the project transferred to the district, was ample, and the assumption of the bonds by resolution of the governing authority of the district, as authorized by the statute made the liability of the district for the payment of the bonds complete and enforceable without the aid of Chapter 15107, Special Acts of 1931, which had the effect of transferring the assets and liabilities of the old district entity to the new district entity having the same name and covering the same territory with the same governing authority. No liabilities were imposed by Chapter 15107 other than those existing under Chapters 12562 and 13940. No bonds were issued by the district under Section 6, Article 9, of the Constitution, as amended in 1930.

Even if it can be said that Chapter 12562, Special Acts of 1927, does not limit the power of taxation therein conferred, that power is not necessarily in question here, since Chapter 13940, Special Acts of 1929, amending Chapter 12562, limits the amount of bonds issued by the two cities which the district was authorized to assume. A failure to duly limit tax-

ing power of a statutory district does not necessarily destroy the corporate entity of the district or its legal functions.

Even if the lands are unconstitutionally included in the district, that does not *ipso facto* invalidate the district or its legal powers, and the remedy is relief of particular lands in the district from illegal taxation at the suit of the landowners. Consolidated Land Co., *et al.,* v. Tyler, *et al.,* 88 Fla. 14, 101 So. 280; Stewart v. Daytona & New Smyrna Inlet Dist. *et al.,* 94 Fla. 859, 114 So. 545; Merriman v. Hutchinson, 95 Fla. 600, 116 So. 271.

The wisdom of the authority conferred by the statutes is not subject to judicial review.

Rehearing denied in each case.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.